IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

LENOX-MACLAREN SURGICAL CORPORATION,
a Colorado corporation,

      Plaintiff,

v.

MEDTRONIC SOFAMOR DANEK USA, INC.,
a Tennessee Corporation,

      Defendant.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff Lenox-MacLaren Surgical Corporation for its Complaint against Defendant Medtronic Sofamor Danek USA, Inc., hereby states as follows:

### I.    THE PARTIES

1.    Lenox-MacLaren Surgical Corporation ("Lenox-MacLaren") is a corporation organized and existing under the laws of Colorado, with a place of business at 657 S. Taylor Avenue, Suite A, Louisville, Colorado 80027.

2.    Upon information and belief, Medtronic Sofamor Danek USA, Inc. ("Medtronic" or "Defendant") is a corporation organized and existing under the laws of the State of Tennessee, having a place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.

## II.    JURISDICTION AND VENUE

3.    This action arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.* for patent infringement; the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq.* ("CCPA"); and the common law of the state of Colorado.

4.    The Court has original subject matter jurisdiction over all asserted claims pursuant to 28 U.S.C. §§ 1331, 1332 (as the amount in controversy exceeds $75,000), and 1367 (the supplemental jurisdiction statute codifying the pendent and ancillary jurisdiction doctrines).

5.    Upon information and belief, Medtronic is subject to personal jurisdiction in this judicial district, as Medtronic regularly conducts business within and has had systematic and continuous contacts with this judicial district, the activities giving rise to Lenox-MacLaren's claims occurred, in part, in this judicial district, and Lenox-MacLaren has been damaged in this judicial district by Medtronic's tortious conduct.

6.    Upon information and belief, venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Medtronic is subject to personal jurisdiction in this judicial district, and a part of the events giving rise to the claims stated, as well as the damage resulting therefrom, occurred in this district.

## III.    GENERAL ALLEGATIONS

7.    Lenox-MacLaren manufactures and sells some of the finest orthopedic and neurological instruments available. It has a worldwide reputation for the finest cutting edges, superb balance, and lightweight, quick-cooling handles for its surgical instruments. Despite its small size, Lenox-MacLaren has established itself as one of the preeminent medical device

2

manufacturers in the world and has gained an esteemed customer base of leading surgeons and hospitals around the world.

8.     Medtronic is a global leader in medical technology. Medtronic prides itself on its extensive patent portfolio and understands the competitive advantages to be gained by acquiring an exclusive right to a particular technological advance. The U.S. Patent and Trademark Office ranked Medtronic number one in the world based on the number of patents issued for medical devices from 1969 through 1998.

9.     Lenox-MacLaren is a recognized innovator in the medical device field and has four issued patents: U.S. Patent No. 6,484,954, entitled "Method and Device for Surgical Bone Grinding;" U.S. Patent No. 6,056,689, entitled "Device and Method for Localized Heart Motion Dampening at a Cardiac Surgical Site;" U.S. Patent No. 5,988,027, entitled "Surgical Rod Cutter;" and U.S. Patent No. 5,865,731, entitled "Surgical Retractor having variable position retractor blades."

10.     On December 8, 2000, Lenox-MacLaren filed a patent application entitled, "Method and Device for Surgical Bone Grinding" directed to an invention for grinding bone for use in orthopedic procedures. Bone segments are fed into a grinding assembly to grind bone into uniform and desirable sized portions suitable for use in cementing of bone implants.

11.     U.S. Patent No. 6,484,954, entitled "Method and Device for Surgical Bone Grinding," issued on November 26, 2002, with 34 claims ("the '954 Patent"), including both device and method claims.

3

A.      **Development Of Bone Mill By Lenox-MacLaren**

12.      Lenox-MacLaren developed its novel bone mill for use in orthopedic procedures where bones are removed from one portion of a patient's body and subsequently ground so that the resulting bone fragments may be utilized to augment or repair defects in other areas of the patient's skeletal system.      Before Lenox-MacLaren's bone mill, orthopedic surgeons were compelled to use heavy and cumbersome bone grinders that did not consistently produce bone particles of a uniform size and that often jammed during cutting and grinding operations.  Lenox-MacLaren developed a relatively lightweight, easily-operated bone mill that permitted easy cleaning/autoclaving and that generated ground bone material of a perfect size for bone regeneration attributes.  Lenox-MacLaren's bone mill (also known as "Bone Fragmenter Unit" or "Bone Mill") is covered by at least one or more claims of the '954 Patent.

B.      **Interest By Medtronic – Multi-Year Exclusive Supply
And License Agreement**

13.      In early 2000, Medtronic expressed a significant interest in Lenox-MacLaren's Bone Mill.  During a span of several months, Medtronic negotiated a multi-year Exclusive Supply and License Agreement, dated April 16, 2000 (the "Exclusive License").  The Exclusive License involved a substantial up-front payment and anticipated that Medtronic would purchase a minimum amount of Bone Mills during the first year under the Exclusive License, totaling over seven figures in U.S. dollars.  Over the multi-year term, Lenox-MacLaren was lead to believe that over $10 million in Bone Mill sales should be anticipated.  As a result of the Exclusive License, Medtronic was precluded from purchasing the Bone Mill or any modified versions thereof from any other source or from making the Bone Mill itself.  Medtronic was responsible for setting the retail price of the Bone Mill, and Lenox-MacLaren was not involved with any of

4

the labeling, marketing, advertising, promotion and/or distribution decisions with respect to the Bone Mills sold to Medtronic.

14. The Exclusive License only provided Medtronic with the ability to purchase Lenox-MacLaren's Bone Mill for resale to the medical marketplace and did not permit Medtronic to manufacture, use, or import the Bone Mill. There was never any right provided to Medtronic to "rent" or "loan" the Bone Mills.

15. The provision of Bone Mills to Medtronic was "conditional" in that such purchases by Medtronic were solely and specifically for Medtronic's "resale" of such units to the marketplace. All other rights were preserved by Lenox-MacLaren.

16. A month after the Exclusive License was signed, Medtronic's Director of Marketing wrote to Lenox-MacLaren to express how pleased he was that the Exclusive License was signed and that Medtronic was "looking forward to selling the bone mills." The letter also informed Lenox-MacLaren that Medtronic would "require a minimum of 500 units during the first year."

17. Based on Medtronic's representations, Lenox-MacLaren had anticipated that it would receive over $2 million under the first year of the Exclusive License and that it would receive at least about $10 million in orders over the multi-year term of the Agreement. It was even contemplated that Medtronic might issue purchase orders in excess of its previous forecasts. Medtronic solicited an exclusive arrangement with its much smaller rival, providing seemingly enticing incentives to enter a relationship that included a significant up-front payment, substantial minimum orders, multi-year term, etc. Medtronic distributed the Bone Mill in the

5

U.S. and in various foreign countries, with all of such Bone Mills including a trademark of Lenox MacLaren thereon.

**C.     Medtronic Failed To Purchase The Minimum Number Of Bone Mills**

18.     Within the first year of the Exclusive License, Medtronic failed to purchase the requisite number of units called for under the Exclusive License to maintain its exclusive rights. This failure provided Lenox-MacLaren with the opportunity to manufacture and market the Bone Mill to other third parties.  Oddly, however, after Medtronic stopped ordering Bone Mills, Lenox-MacLaren was never able to achieve significant Bone Mill sales.  Lenox-MacLaren's inability to achieve significant sales of the Bone Mill was puzzling, especially in view of the positive feedback that Lenox-MacLaren had received from surgeons and hospitals with respect to the Bone Mill.

**D.     Medtronic's Loaner Program**

19.     Without seeking any amendment to the Exclusive License or obtaining the permission of Lenox-MacLaren, upon information and belief, sometime after the effective date of the Exclusive License, Medtronic initiated a "Loaner Program" that included the Bone Mill.

20.     Upon information and belief, of the total units Medtronic purchased from Lenox-MacLaren under the Exclusive License, a significant number of such units were not "resold," but rather, Medtronic maintained ownership of such units for use in Medtronic's "Loaner Program."

21.     Upon information and belief, Medtronic's Loaner Program involved the provision of various tools and devices (including, but not limited to, the Bone Mill) that a surgeon may use when implanting medical devices into a patient.  Such tools and devices were provided by

6

Medtronic in a package with implants and certain bone replacement substances (e.g., Infuse bone graft material), and after such surgery, such tools and devices would then be returned to Medtronic for subsequent use by other entities placing orders for implants. In this manner, the tools and devices provided by Medtronic, including the Bone Mill, were considered to be merely "loaned" to surgeons or hospitals. Upon information and belief, Medtronic charged a certain amount for each such package provided to a surgeon or hospital, with such charges including the permission to use included tools and devices for the surgical operation.

22.    Upon information and belief, Medtronic conveyed instructions to users of the Bone Mill as to how to use the Bone Mill. The instructions provided by Medtronic included using the Bone Mill to grind bone, such Bone Mill having a housing with a bone chute, and a grinding assembly.

23.    Upon information and belief, Medtronic benefited greatly from the provision of the popular Bone Mill as a part of its offered implant packages. Surgeons and hospitals that could have ordered other competitors' implants, would instead select Medtronic's implants at least partially due to the ability to utilize the Bone Mill in such surgical procedures. As such, upon information and belief, Medtronic achieved increased sales of its implants, bone graft materials, etc., because it offered the Bone Mill as part of its "Loaner Program."

24.    Upon information and belief, Medtronic permitted the Bone Mills to be "loaned" to various surgeons and hospitals potentially thousands of times, with a single Bone Mill often used for a number of surgeries. Upon information and belief, it is estimated that the number of sales that Lenox-MacLaren could have made to entities that "loaned" rather than purchased the

7

Bone Mill, is in the thousands of units, and thus, Lenox-MacLaren lost at least several million dollars in potential Bone Mill sales.

### E.   Lenox-MacLaren Notified Medtronic Of The Issuance Of The Bone Mill Patent

25.    Two years after the Exclusive License was signed, Lenox-MacLaren notified Medtronic that the Bone Mill patent (i.e., the '954 Patent) had issued, specifically mentioning the method claims of such patent, which covered the use of the Bone Mill in surgical operations.

26.    On March 18, 2003, Medtronic informed Lenox-MacLaren that despite the issuance of the '954 Patent, Medtronic "[did] not require a license from Lenox-MacLaren to resell products that it bought from Lenox-MacLaren with the mutually agreed purpose of resale." (emphasis supplied).

27.    Despite being informed of the issuance of the '954 patent, Medtronic took no steps to notify purchasers or users of the Bone Mill that it was protected by a patent.

28.    Medtronic has never alleged that the Bone Mill is not covered by valid, enforceable patent claims.

### F.   Medtronic Informs Lenox-MacLaren That The Bone Mills Must Be Recalled

29.    In September, 2006, (just two months prior to the issuance of Medtronic's patent on its own Automatic Bone Mill, U.S. Patent No. 7,131,605) Medtronic contacted Lenox-MacLaren directly to inform it of reports (by three surgeons in Japan) that the Bone Mill had allegedly generated metal debris in fragmented tissue.    Based on these isolated and unverified incidences, Medtronic insisted that Lenox-MacLaren immediately institute with the

FDA a voluntary recall of all Bone Mills. Medtronic never provided Lenox-MacLaren with any of the Bone Mills from Japan that allegedly had problems.

30.    Approximately one week prior to Medtronic's demand that an FDA recall be instituted, Lenox-MacLaren received a call from a Medtronic representative, asking Lenox-MacLaren for a quote to produce a single Bone Mill for Medtronic. Lenox-MacLaren declined the request to produce a single unit, but agreed to send a quote (which it did) to produce 100 Bone Mills. Medtronic never responded to Lenox-MacLaren's quote, but rather later contacted Lenox-MacLaren about the alleged Japanese complaints.

31.    The reports of problems with the Bone Mill were surprising to Lenox-MacLaren due to the fact that the Bone Mill had been a successful, safe, and effective invention that, in the hands of skilled surgeons throughout the world, had assisted literally thousands of patients. After over five years and thousands of surgeries, not a single patient injury had been reported resulting from a problem with the Bone Mill.

32.    On or about September 2006, was the first time Medtronic became aware of any alleged occurrences where a Bone Mill showed the potential to create metal debris, despite Medtronic's distribution of the Bone Mill since 2001.

33.    Medtronic informed Lenox-MacLaren that, based on actual tests Medtronic had performed, metal debris produced by the Bone Mill would become commingled with fragmented bone.

34.    Medtronic forwarded to Lenox-MacLaren a Bone Mill, purportedly "unused," so that Lenox-MacLaren could conduct further testing to determine whether it could confirm Medtronic's findings. Lenox-MacLaren conducted its own tests on such Bone Mill, but could

9

not reproduce the alleged metal debris that Medtronic said was generated by the Bone Mill. Lenox-MacLaren even shipped replacement cutting blades to Medtronic to see if the use of such blades eliminated any perceived problems with the Bone Mill. Medtronic never provided any evidence to Lenox-MacLaren that showed that such replacement blades failed to ameliorate the alleged problem.

35.    Despite Lenox-MacLaren informing Medtronic that it could not reproduce the alleged metal debris problem under normal use, Medtronic persisted in its demand that Lenox-MacLaren immediately contact the FDA to initiate voluntary recall proceedings. Noting that "Medtronic's reputation and trademark in the worldwide medical community have a tremendous value," Medtronic stated that, only under certain conditions, it "would be willing to provide assistance to Lenox-MacLaren's product recall" (emphasis added) provided that: Lenox-MacLaren submitted a validation, acceptable to Medtronic, that replacement cutting blades would be sufficient to remedy the problem; Medtronic received all product specifications and design, development, manufacturing and test data and material qualification information to verify Lenox-MacLaren complies with laws and regulations related to the hazard of the bone fragmenter; and Lenox-MacLaren be the principal contact with the FDA with respect to the recall, including the submission of all required forms to the FDA. Medtronic declined to be responsible for all the expenses that may be incurred by Lenox-MacLaren in taking such actions and only agreed to "be responsible for its equitable, reasonable share of the financial expenses as it relates to Medtronic customers."

36.    When Lenox-MacLaren informed Medtronic that such sharing of expenses would amount to about 90% of the total expenses, Medtronic failed to accept such financial

10

responsibilities and proceeded to independently initiate a voluntary, FDA-related recall of the Bone Mill.

37.    In October of 2006, one month prior to the issuance of Medtronic's Automatic Bone Mill patent, Medtronic informed Lenox-MacLaren that it had made a decision to recall the Bone Mills and provided a device recall notice to Lenox-MacLaren.

G.    **FDA Investigations:  Same Product; Different Results**

38.    Despite the admittedly low number of purported incidences of reported issues, Medtronic immediately recalled the Bone Mills on behalf of Lenox MacLaren.

39.    Medtronic purposefully contacted those in possession of the Bone Mills and instructed them to immediately discontinue use of the Bone Mills.

40.    Medtronic informed those that possessed Bone Mills that a Medtronic representative would be physically retrieving the Bone Mills and that Medtronic would only be offering credit for such Bone Mills.

41.    Medtronic sent out questionnaires in order to obtain records of any patient injuries that may have occurred using the Bone Mill, providing self-addressed stamped envelopes to prompt a response by November 17, 2006.

42.    Medtronic communicated with entities in the medical marketplace that its action, including the physical retrieval of Bone Mills, the offering of credit for such returned Bone Mills to be used for future Medtronic purchases, and the need for completed responses to its questionnaire, was necessary to ascertain that only safe and effective products of the highest quality were being provided to Medtronic's customers.

11

43.     Upon information and belief, Medtronic contacted entities that had "loaned" as well as those that had purchased Bone Mills.

44.     As reflected at the FDA's web site

(http://www.fda.gov/bbs/topics/enforce/2006/ENF00979.html), Medtronic/Danek instituted a

voluntary recall of at least 255 of the bone mills (see excerpt below).

> *PRODUCT*
> *Medtronic Sofamor Danek, Bone Fragmentor, Ref Number 9150111- Device, Recall # Z-0176-2007*
> *CODE*
> *Lot numbers: 36197, 36200, 36298, 36199, 36196, 40591, 54685, 70942, 70605, 74679, 18150, 20271, 7935*
> *RECALLING FIRM/MANUFACTURER*
> *Recalling Firm: Medtronic Sofamor Danek USA Inc., Memphis, TN, by letter on October 20, 2006.*
> *Manufacturer: Lenox-MacLaren Surgical Corp., Louisville, CO. Firm initiated recall is ongoing.*
> *REASON*
> *Metal bone fragmentor was causing metal shavings to be released into the resultant fragmented tissue during use.*
> *VOLUME OF PRODUCT IN COMMERCE*
> *255 units*
> *DISTRIBUTION*
> *Nationwide and Internationally*

45.     Due to Medtronic's actions, the FDA contacted Lenox-MacLaren and proceeded to perform a several day, extensive investigation to follow up on the alleged complaints Medtronic had received from Japan involving use of the Bone Mill. As a result of the investigation, the FDA investigator did not conclude that the Bone Mill posed a significant risk to human health and the FDA did not require Lenox-MacLaren to recall any of the Bone Mills that it sold to its own customers.

46.     Upon information and belief, Lenox-MacLaren was compelled, at great expense and duress, to unnecessarily undergo an FDA investigation as to the alleged need for a recall of the Bone Mills. The results of such FDA investigation, however, revealed that no recall was called for.

### H.     Lenox-MacLaren First Becomes Aware Of The Damages It Has Suffered Due To Medtronic's Extensive "Loaner Program"

47.     In discussions with Medtronic concerning the FDA issues relating to the Bone Mill, Lenox-MacLaren first learned that Medtronic had, in fact, been promulgating an extensive "Loaner Program" for the patented Bone Mills.

48.     Upon information and belief, the pool of available customers that were ready, willing and able to purchase Bone Mill units from Lenox-MacLaren was severely limited in view of Medtronic's unauthorized "loaning" of such units to anyone who "purchased" Medtronic's spinal surgery packages, which included one of the patented Bone Mills. Upon information and belief, this practice by Medtronic effectively destroyed the ability of Lenox-MacLaren to sell its popular, patented Bone Mills.

### I.     Medtronic's Introduction Of Its Own Bone Mill

49.     Despite having Lenox-MacLaren locked into an Exclusive License that prevented Lenox-MacLaren from selling its Bone Mill, Medtronic filed its own patent applications for a bone mill. Medtronic owns U.S. Patent No. 6,824,087, entitled "Automatic Bone Mill," filed June 28, 2002, and issuing November 30, 2004 ("the '087 Patent"), and U.S. Patent No. 7,131,605, entitled "Automatic Bone Mill," filed December 31, 2003, and issuing November 7, 2006 ("the '605 Patent"). Despite Medtronic being fully aware of Lenox-MacLaren's '954 Patent on the Bone Mill, Medtronic failed to disclose such patent or the existence of the Lenox-

13

MacLaren Bone Mill, to the United States Patent and Trademark Office ("USPTO") during the prosecution of either the '087 or '605 Patents. Medtronic has a currently pending patent application, Publication No. 2006/0226267, filed March 16, 2005, and published October 12, 2006, entitled "Apparatus and Method for Bone Morselization for Surgical Grafting." To date, Medtronic has failed to disclose the '954 Patent to the USPTO.

50.     Upon information and belief, Medtronic is presently marketing one or more bone mills encompassed by one or more of its issued or pending patents. Medtronic recently introduced its Midas Rex Legend® bone mill and touts that: "[t]he Bone Mill maximizes processed bone yield and produces homogenous particulate sizes of bone." The Midas Rex Legend® bone mill is advertised as allowing the addition of additives during processing and that it works with certain bone graft materials. Upon information and belief, Medtronic has also introduced a competing, disposable bone mill under the name, C.H.O.M.P.

51.     Upon information and belief, Medtronic knew that the application for the '605 Patent had been allowed on or about June 26, 2006, because Medtronic received a Notice of Allowance from the USPTO. Upon information and belief, in view of this information, Medtronic sought to have Lenox-MacLaren's Bone Mill recalled from the U.S. marketplace to facilitate increased sales of its competing bone mill product(s).

### J.     Medtronic Devised A Business Strategy To Effectively Eliminate Competition For The Bone Mill

52.     Upon information and belief, to ensure that a potential competitor would be unable to make substantial inroads into a desired marketplace, Medtronic devised and implemented a business strategy whereby it would:

      a.     tie up exclusive rights to innovative designs from a third party;

14

b.     introduce such innovative designs to the marketplace under Medtronic's well established name;

c.     spend the requisite amount of time and effort required to have the marketplace adopt the innovative design as a desired, if not necessary, component for surgical operations;

d.     take steps to ensure that Medtronic could eliminate any long term and potentially expensive commitments under any agreement with a third party innovator;

e.     develop Medtronic's own substitute product for the marketplace;

f.     introduce Medtronic's new product as a substitute for the third party's innovative product in the now established product line;

g.     take steps to ensure that any possible competition by the third party innovator is hindered by effecting a recall of the earlier innovative product; and

h.     capitalize on the vacuum created by the recall of the third party innovative product by ramping up marketing of Medtronic's substitute (and preferably patented) product.

53.     Upon information and belief, Medtronic promulgated a version of the above referenced business strategy in its dealings with Lenox-MacLaren based on the foregoing conduct and more specifically, by at least:

a.     entering into the multi-year Exclusive License with Lenox-MacLaren to obtain exclusive rights in the innovative Bone Mill;

15

b.      successfully introducing the Bone Mill under Medtronic's name throughout the world;

c.      after purchasing a desired number of Bone Mills for Medtronic's "loaner program," purposefully reducing the number of Bone Mills ordered so that further requirements to purchase more Bone Mills would be eliminated;

d.      launching an unauthorized "Loaner Program" that included the Bone Mill in a fashion that deprived Lenox-MacLaren of significant sales of the Bone Mill because Medtronic was essentially providing such Bone Mills for "free;"

e.      with knowledge that Medtronic would obtain patent protection for its own bone mill, instigating an FDA recall of the Lenox-MacLaren Bone Mill after unsuccessfully attempting to get Lenox-MacLaren to do so; and

f.      marketing Medtronic's Midas Rex bone mill to prior users of the Bone Mill.

54.    Upon information and belief, Medtronic attempted to push Lenox-MacLaren entirely out of the marketplace by disparaging Lenox-MacLaren's reputation in the medical device field.  Upon information and belief, by intentionally promulgating inaccurate and/or misleading information about the Bone Mill, Medtronic essentially assured itself that the medical device community, already wary of purchasing any products that had been tainted with a possible problem (for example, products under a FDA recall notice), would shy away from doing further business with Lenox-MacLaren, including purchasing Lenox-MacLaren's Bone Mill.

16

55.     Upon information and belief, Medtronic not only wanted to supplant the formerly, very successful Bone Mill of Lenox-MacLaren with Medtronic's own patented bone mill, but further wanted to entirely remove Lenox-MacLaren's Bone Mill from the marketplace.  Upon information and belief, Medtronic's FDA recall scheme was a perfect tool by which to do so.  Despite its considerable efforts and employment of pressure tactics, Medtronic failed to convince Lenox-MacLaren to initiate such a FDA recall on its own volition.  Medtronic nevertheless pursued such a FDA recall of the Bone Mill "on behalf of" Lenox-MacLaren, without sufficient grounds to do so, requiring Lenox-MacLaren to expend considerable funds on legal counsel and to prepare for the potentially severe consequences of a negative assessment by the FDA.  As demonstrated by the FDA's findings after its thorough investigation of Lenox-MacLaren's Bone Mill, however, there was never any basis for Medtronic to contend that the Bone Mill posed a substantial threat to human health.

56.     There was never any verified demonstration that the Bone Mill, when properly operated, created metal debris that could become commingled with fragmented bone produced using the Bone Mill.

## L.     Medtronic's Conduct Also Constitutes Contributory Infringement Of The Method Claims Of The '954 Patent

57.     Upon information and belief, Medtronic facilitated the use of the Bone Mill by others by including the Bone Mill with certain "loaner" packages Medtronic provided to hospitals and surgeons.   Because the Bone Mill has no substantial non-infringing uses, Medtronic's conduct also constitutes contributory infringement of the '954 Patent claims.  Upon information and belief, Medtronic received considerable value due to its "Loaner Program" in that it charged a significant amount of money to purchasers of medical implant devices that were

accompanied by the "loaned" instruments, tools, bone graft materials (e.g., Medtronic's Infuse®

bone graft), etc. used in surgical implant operations. Lenox-MacLaren is entitled to at least a

reasonable royalty predicated on the convoyed sales of the "loaner packages" Medtronic

provided to its customers.

58.    Upon information and belief, the ability to use the Bone Mill, which was included

with Medtronic's loaner packages, was an important factor in a purchaser's decision to buy

Medtronic's products.

## IV.    FIRST CLAIM FOR RELIEF
### (Infringement of the '954 Patent)

59.    Lenox-MacLaren incorporates paragraphs 1 through 58 as though fully set forth

herein.

60.    Lenox-MacLaren is the owner of U.S. Patent No. 6,484,954 ("the '954 Patent"),

entitled "Method and Device for Surgical Bone Grinding." The '954 Patent was duly and legally

issued on November 26, 2002. A true and correct copy of the '954 Patent is attached to this

Complaint as Exhibit A.

61.    On information and belief, Medtronic has infringed and/or induced infringement

of one or more claims of the '954 Patent, directly and/or indirectly, in violation of 35 U.S.C. §

271 by making, using, selling and/or offering for sale certain of its products, services, methods

and/or systems in the U.S.

62.    Upon information and belief, Medtronic has contributorily infringed the '954

Patent in violation of 35 U.S.C. § 271 by offering for sale and selling components, which

constitute a material part of the inventions claimed by the '954 Patent, with the knowledge that

such components were used to infringe the '954 Patent.

18

63.    Pursuant to 35 U.S.C. § 284, Lenox-MacLaren is entitled to damages for Medtronic's infringement.

64.    Medtronic's infringement of the '954 Patent was willful and in wanton disregard for Lenox-MacLaren's patent rights.   Medtronic's continued actions, after notification of Lenox-MacLaren's patent rights, constitute objective recklessness and/or willful and infringing conduct.

## V.    SECOND CLAIM FOR RELIEF
### (Violation Of The Colorado Consumer Protection Act)
### Colo. Rev. Stat. § 6-1-101 *et seq.*

65.    Lenox-MacLaren incorporates paragraphs 1 through 64 as though fully set forth herein.

66.    Based on the allegations set forth above, Defendant Medtronic has, in bad faith, violated the Colorado Consumer Protection Act, §§ 6-1-105.

67.    Both Lenox-MacLaren and Defendant Medtronic sold Bone Mills and as such, are competitors in the Bone Mill market.

68.    During the course of business in the selling and distributing of Bone Mills, Defendant Medtronic engaged in unfair or deceptive trade practices by knowingly making misrepresentations about the characteristics and/or qualities of the Bone Mills.

69.    Upon information and belief, these false representations were disseminated by at least Defendant Medtronic's "Urgent Device Recall" notice ("Recall Notice") (attached hereto as Exhibit B).   For example, the Recall Notice falsely and/or inaccurately stated that Lenox-MacLaren's Bone Mills had "shown the potential to create metal debris that could become commingled with the fragmented bone produced using these instruments."   Upon information

19

and belief, under normal use, no such potential for a safety hazard existed with the Bone Mill. Accordingly, Medtronic's characterizations were false, misleading and unnecessary.

70.     Upon information and belief, the false representations made by Defendant Medtronic have significantly impacted actual consumers.  Upon information and belief, the Recall Notice was sent to all of Defendant Medtronic's customers of the Bone Mill (e.g., doctors and/or hospitals).  Upon information and belief, a portion of these consumers, fully aware of the implications of a FDA recall (e.g., potential injury to patients and professional liability), stopped using and returned the Bone Mills to Defendant Medtronic.

71.     Medtronic provided an incentive to entities that returned the Bone Mills, by offering them a credit based on the purchase price of the Bone Mill, with such credit only available for use with future Medtronic purchases.

72.     Upon information and belief, as a direct result of Defendant Medtronic's false statements and misrepresentations, Lenox-MacLaren has been and continues to be injured in amounts to be determined at trial.

## VI.     THIRD CLAIM FOR RELIEF
### (Business Disparagement/Trade Libel)

73.     Lenox-MacLaren incorporates paragraphs 1 through 72 as though fully set forth herein.

74.     Upon information and belief, Defendant Medtronic has, in bad faith and malice, intentionally and knowingly published false and/or misleading statements that are derogatory to Lenox-MacLaren and its business.

75.     Upon information and belief, Defendant Medtronic wrongfully made the foregoing statements knowing that they would likely induce actual and potential customers not to deal with Lenox-MacLaren.

76.     Defendant   Medtronic's   wrongful   acts   constitute   actionable   business disparagement/trade libel.

77.     As a result of Defendant Medtronic's wrongful acts, Lenox-MacLaren has suffered damages in amounts to be determined at trial.

78.     Lenox-MacLaren has been and will continue to be irreparably harmed by Defendant Medtronic's unlawful actions and has no adequate remedy at law.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lenox-MacLaren prays for judgment in its favor and against Medtronic as follows:

a.     that Medtronic, its officers, directors, agents, servants, employees, privies, representatives, attorneys, parent and subsidiary corporations or other related entities, successors and assigns, and all persons in active concert or participation with any of them, be permanently enjoined from directly or indirectly infringing, inducing others to infringe and/or contributing to the infringement of the '954 Patent;

b.     that Medtronic be required to provide an accounting of damages resulting from Medtronic's infringement of the '954 Patent;

c.     that Lenox-MacLaren be awarded damages in an amount to be determined at trial for all infringing activities, which are at least a reasonable royalty;

d.      that Lenox-MacLaren be awarded treble damages by reason of the willful, wanton, and deliberate nature of Medtronic's infringement pursuant to 35 U.S.C. § 284;

e.      that Defendant Medtronic be found liable for trade libel against Lenox MacLaren and that Defendant Medtronic be ordered to pay damages caused thereby;

f.      that Defendant Medtronic be found liable for commercially disparaging Lenox-MacLaren's services, products and business and that Defendant Medtronic be ordered to pay damages caused thereby;

g.      that Defendant Medtronic be found liable for violation of the Colorado Consumer Protection Act and that it be ordered to pay damages caused thereby and Lenox-MacLaren's attorneys' fees;

h.      that Lenox MacLaren be awarded punitive damages;

i.      that Lenox-MacLaren be awarded its pre-judgment and post-judgment interest;

j.      that Lenox-MacLaren be awarded costs and expenses of suit, including expert witness fees;

k.      that Lenox-MacLaren be awarded its attorneys' fees as this is an exceptional case under 35 U.S.C. § 285;

l.      that Medtronic be ordered to deliver to Plaintiff, for destruction at Plaintiff's option, all products that infringe the patent-in-suit;

m.      that Medtronic be required to account for all gains, profits, advantages, and unjust enrichment derived from its violations of law; and

n.    that Lenox-MacLaren be awarded other and further relief as the Court

deems appropriate and just.

## VIII.   JURY DEMAND

Lenox-MacLaren requests a jury trial on all issues so triable.

DATED: October __/__, 2007.

Respectfully submitted,

By:   __s/ Stanley M. Gibson_____
         Stanley M. Gibson
         *SGibson@jmbm.com*
         JEFFER, MANGELS, BUTLER &
             MARMARO LLP
         1900 Avenue of the Stars, 7th Floor
         Los Angeles, California  90067
         Telephone:  (310) 203-8080
         Facsimile:  (310) 712-8548

         Joseph E. Kovarik
             *jkovarik@sheridanross.com*
         SHERIDAN ROSS P.C.
         1560 Broadway, Suite 1200
         Denver, Colorado  80202-5141
         Telephone:  (303) 863-9700
         Facsimile:  (303) 863-0223
         E-Mail:  litigation@sheridanross.com

         **ATTORNEYS FOR PLAINTIFF
         LENOX-MACLAREN**

Plaintiff's Address:
657 S. Taylor Avenue, Suite A
Louisville, Colorado  80027

C:\Documents and Settings\sj2\Local Settings\Temporary Internet Files\OLK61\Complaint.doc