IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 07-cv-02054-MSK-KMT

LENOX-MACLAREN SURGICAL CORPORATION,

    Plaintiff,

v.

MEDTRONIC SOFAMOR DANEK USA, INC.,

    Defendant.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

This matter is before the court pursuant to an Order of Reference to the United States Magistrate Judge issued by District Judge Marcia S. Krieger on December 17, 2007 [Doc. No. 15]. This case involves claims of patent infringement, violation of the Colorado Consumer Protection Act, and business disparagement/trade. This matter is before the court on Defendant's "Motion to Stay Lawsuit and Compel Arbitration" filed December 5, 2007 [Doc. No. 11].

### FACTUAL BACKGROUND

*1.*     *Facts*

The following facts are taken from Plaintiff's Complaint, Defendant's Answer, and the parties' submissions with respect to this Recommendation. Plaintiff Lenox-Maclaren Surgical Corporation manufactures orthopedic and neurological instruments. (Compl. with Jury Demand ¶ 7 [filed October 1, 2007] [ hereinafter "Compl."].) Defendant Medtronic Sofamor Danek USA,

Inc., is a global leader in medical technology. (Def.'s Answer to Pl.'s Compl. [filed December 5, 2007] [hereinafter "Answer"].) On April 16, 2000, the parties entered into an "Exclusive Supply and License Agreement" [hereinafter "Agreement"] which terminated five years later. (Medtronic's Mot. to Stay Lawsuit and Compel Arbitration at 1–2, Ex. A [filed December 5, 2007] [hereinafter "Mot."].) Under the Agreement, Defendant agreed to purchase bone mills from Plaintiff. (Compl. ¶ 13.) Plaintiff avers the Agreement precluded Defendant from "purchasing the [b]one [m]ill or any modified versions thereof from any other source or from making the [b]one [m]ill itself." (*Id.*)

Plaintiff states that Defendant failed to purchase the requisite number of units called for under the Agreement, and, without seeking an amendment to the Agreement, Defendant initiated a "loaner program" under which bone mills were provided in packages to be used for surgeries and then returned to Defendant for subsequent use by other entities. (*Id.* ¶¶ 18–21.) Plaintiff asserts that the "loaner program" increased Defendant's sales of its own products because surgeons and hospitals would select Defendant's products in order to utilize the Plaintiff's bone mill included in the package. (*Id.* ¶ 23.) Plaintiff estimates the number of sales it could have made to entities that were "loaned" the bone mills is in the thousands and cost Plaintiff at least several million dollars. (*Id.* ¶ 24.)

Plaintiff contends that two years after the Agreement was entered, Plaintiff notified Defendant that the bone mill patent had issued, specifically mentioning that the patent covered the use of the bone mill in surgical operations; however, Defendant informed Plaintiff that it did not require a license to resell products that it bought from Plaintiff. (*Id.* ¶¶ 25–26.) Further, Plaintiff

2

contends that Defendant took no steps to notify purchasers of the bone mill that it was protected by a patent. (*Id.* ¶ 27)

Defendant states that in 2006 it received complaints from surgeons regarding Lenox-Maclaren's bone mills, and that it immediately notified Plaintiff of the complaints. (Mot. at 2.) Defendant asserts that Plaintiff "first admitted it was aware of the problem, then later claimed that it was unable to reproduce the product failure and refused to recall the bone mills." (*Id.*) Defendant states it reported the adverse incidents to the FDA, initiated a recall of the bone mills, and stopped selling the bone mills. (*Id.*) In addition, Plaintiff contends that Defendant contacted those in possession of the bone mills and instructed them to discontinue use. (Compl. ¶ 39.) Plaintiff states that, following investigation to follow up on the complaints regarding the bone mill, the FDA did not require Plaintiff to recall any of the bone mills it sold to its own customers. (*Id.* ¶ 45.)

Plaintiff asserts that the Agreement prevented Defendant from selling its own bone mill. (*Id.* ¶ 49.) Plaintiff states that their bone mill is covered by at least one or more claims of U.S. Patent No. 6,484,954, entitled "Method and Device for Surgical Bone Grinding." (*Id.* ¶¶ 11–12.) Defendant filed its own applications for a bone mill patent on June 28, 2002 and December 31, 2003. (Answer ¶ 49.) The patent was issued on November 7, 2006. (*Id.*) Plaintiff contends that Defendant failed to disclose Plaintiff's '954 Patent on the Lenox-Maclaren bone mill to the United States Patent and Trademark Office. (Compl. ¶ 49.) Plaintiff further alleges that Defendant knew that its own patent application had been allowed and, in light of this information, Defendant sought to have Plaintiff's bone mill recalled "to facilitate increased sales of its competing bone mill

product(s)." (*Id.* ¶ 51.) Plaintiff asserts Defendant devised a business strategy to eliminate competition and to push Plaintiff out of the marketplace by disparaging its reputation. (*Id.* ¶¶ 53–55.)

Plaintiff claims Defendant's inclusion of the bone mill in "loaner" packages constitutes contributory infringement of the '954 Patent claims. (*Id.* ¶ 57.) In addition, Plaintiff alleges claims for violations of the Colorado Consumer Protection Act and business disparagement/trade libel. (*Id.* ¶¶ 65–78.)

Defendant asserts the Agreement includes an arbitration clause that requires the parties to arbitrate "any dispute arising out of or relating to" the Agreement. (Mot. at 2.) Defendant asserts all of Plaintiff's claims arise out of and relate to the Agreement. (*Id.*) Plaintiff states that mediation is a mandatory condition precedent to arbitration and, therefore, Defendant's motion is not ripe. (Pl.'s Resp. to Medtronic's Mot. to Stay Lawsuit and Compel Arbitration at 2–3 [filed January 7, 2007] [hereinafter "Resp."].) Plaintiff also argues that the request to arbitrate all claims is overreaching and should be denied. (*Id.* at 3.)

2. ***Procedural History***

Plaintiff's Complaint was filed October 1, 2007. (Compl.) Defendant filed its motion to stay the lawsuit and compel arbitration on December 4, 2007. (Mot.) Plaintiff filed their response on January 7, 2008. (Pl.'s Resp. to Medtronic's Mot. to Stay Lawsuit and Compel Arbitration" [hereinafter "Resp."].) Defendant filed its reply on January 18, 2008. (Medtronic's Reply in Supp. of its Mot. to Stay Lawsuit and Compel Arbitration [hereinafter "Reply"].) This motion is ripe for review and recommendation.

4

**ANALYSIS**

*1.   Federal Arbitration Act*

Defendant states, and Plaintiff does not dispute, that the Agreement is governed by the Federal Arbitration Act because it involves interstate commerce. (Mot. at 3.) Paragraph 12 of the Agreement states as follows:

> The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement by negotiation between the executives. If the parties are unable by negotiation to resolve any such dispute, the dispute shall be submitted to mediation in Denver, Colorado in an attempt to resolve any existing disputes. If unsuccessful, such disputes shall be settled by binding arbitration in accordance with the then current Rules of the American Arbitration Association. . . .  The arbitration shall be conducted in Denver, Colorado and shall be governed by the United States Arbitration Act, 9. U.S.C. 1-16. . . .

(Mot., Ex. A at ¶ 12.)

*2.   Scope of Agreement*

Where the parties dispute "'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy, [the question] is for the court.'" *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 84 (2002). The court must first examine the scope of the agreement and then determine whether the claims fall within the scope. *Id.* To determine whether a particular dispute falls within the scope of an arbitration agreement's clause, the court must first classify the clause as either broad or narrow. *Id.* Broad clauses purport to refer all disputes arising out of a contract to arbitration. *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988). An arbitration clause which

covers not only the issues arising under a contract, but even those issues with any connection to the contract, is a broad arbitration clause. *Feil v. MBNA America Bank, N.A.*, 417 F. Supp. 2d 1214, 1219 (D. Kan. 2006); *see also Cummings*, 404 F.3d at 1262 (describing a "broad provision" as one that "refers all disputes arising out of a contract to arbitration"); *Spahr v. Secco*, 330 F.3d 1266, 1270 (10th Cir. 2003) (describing broad provisions as those requiring arbitration of "all disputes arising out of or relating to the overall contract").

In this case, the Agreement states that the parties shall attempt to mediate or arbitrate "any dispute arising out of or relating to this Agreement." (Agreement ¶ 12.) This language is clearly inclusive of the disputes at issue and, therefore, the Agreement should be considered a broad one.

### *3.     Presumption of Arbitrability*

"Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim implicates issues of contract construction or the parties' rights and obligations under it." *Cummings*, 404 F.3d at 1261; *see also Feil*, 417 F. Supp. 2d at 1219 ("When a contract contains a broad arbitration clause, matters that touch the underlying contract should be arbitrated."). The Supreme Court has enforced a liberal federal policy favoring arbitration agreements, under which doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Cummings* at 1262. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83

(1960). Doubts should be resolved in favor of coverage. *Id.* In the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. *Feil* at 1291 (citing *AT&T Techs. Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986)).

Here, where the court has already determined the arbitration clause contained in the Agreement is a broad one, there is a presumption of arbitrability. Furthermore, the plaintiff has provided no "positive assurance" that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

   *a.* ***Presumption of Continuing Arbitrability Absent Showing of Intent to Repudiate***

Under the federal common law of arbitrability, an arbitration provision in a contract is presumed to survive the expiration of that contract unless there is some express or implied evidence that the parties intend to override this presumption: "In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." *Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243, 255 (1977). Thus, when a dispute arises under an expired contract that contained a broad arbitration provision, courts must presume that the parties intended to arbitrate their dispute, even if the facts of the dispute occurred after the contract expired. *Id.* The presumption in favor of continuing arbitrability, however, disappears if the parties express or clearly imply an intent to repudiate post-expiration arbitrability. *See id.* at 254-55; *United Food & Commercial Workers Int'l Union v. Gold Star Sausage Co.*, 897 F.2d 1022, 1026 (10th Cir. 1990).

In their Motion and Reply, Defendant cites multiple cases, including *Image Software, Inc. v. Reynolds and Reynolds Co.*, 459 F.3d 1044 (10th Cir. 2006), and *Encore v. Promise Keepers*, 53 F. Supp. 2d 1101 (D. Colo. 1999), in support of their argument that claims that arise after the expiration of the original license agreement are arbitrable. The court does not find these cases convincing, as all of the cases cited by Defendant involved claims which arose after entry into a subsequent agreement or contract, where the original contract had an arbitration clause but the subsequent contract or agreement did not. In this case, the parties did not enter into any subsequent contract or agreement. The only contract entered into by Plaintiff Lenox-Maclaren and Defendant Medtronic is the Agreement entered into on April 16, 2000.

Regardless, in this case, the Plaintiff fails to offer any evidence suggesting that the parties did not intend for the arbitration clause to survive termination of the contract. There being no showing of an express or implied intent to repudiate the expired Agreement, the court must presume that the parties intended to arbitrate their disputes.

### b. *Presumption of Continuing Arbitrability Where Dispute Arises Under Contract*

The presumption in favor of continuing arbitrability also disappears if the dispute cannot be said to arise under the contract. *See id.* All claims with a significant relationship to the agreement, regardless of the label attached, arise out of and are related to the agreement. *Id.* A dispute "arises under" a previous contract if it "involve[s] rights which to some degree have vested or accrued during the life of the contract and merely ripened after termination, or relate to events which have occurred at least in part while the agreement was still in effect." *United Food*, 897 F.2d at 1024-25 (quotation omitted).

Plaintiff asserts that the claims for violations of the Colorado Consumer Protection Act ("CCPA") and business disparagement/trade libel do not arise under the Agreement because the claims are based on Defendant's conduct that occurred outside of the context of the Agreement and long after expiration of the Agreement. (Resp. at 3–4.) Defendant argues that the CCPA claim and the business disparagement claims are based on Plaintiff's allegation that Defendant made misrepresentations about the characteristics and/or qualities of the bone mills that Defendant bought from Plaintiff under the Agreement. (Mot. at 9–11.) Defendant further argues that these claims are tied to and implicates multiple provisions of the Agreement, in that (1) "the [] Agreement provides that [Plaintiff] 'represents and warrants that all of the products sold to Medtronic under this Agreement will be free from defects. . ."; and (2) Plaintiff warranted that "the Products have been manufactured and sold to Medtronic in compliance with all applicable federal, state, and municipal laws, rules, and regulations, including all Food and Drug Administration ("FDA") laws, rules and regulations. . . ." (*Id.*; Ex. A at ¶¶ 4.1, 8.1.) Defendant also states that the Agreement provides that Defendant "shall be responsible for all marketing decisions, including, but limited to the labeling, packaging, advertising, promotion and distribution of the Product." (Mot., Ex. A at ¶ 10.1.) Defendant avers that Plaintiff's claims will "turn on whether or not Lenox breached the [A]greement by failing to provide defect-free products to Medtronic, and whether the [] Agreement authorized Medtronic to make necessary decisions about marketing and distribution (and recall) of the product." (Mot. at 9–10.)

Plaintiff supports its CCPA claim by alleging that Medtronic's Urgent Recall Notice contained false, misleading, and unnecessary characterizations as to the bone mills. (Resp. at 4.)

9

In addition, Plaintiff states its business disparagement/trade libel claim is premised on Medtronic's publishing of false and/or misleading derogatory statements regarding Plaintiff. (*Id.*) Plaintiff argues that the alleged misconduct occurred "years after" or "long after" the expiration of the Agreement. (*Id.*)

The court agrees with Defendant that the CCPA claim arises from and/or relates to the Agreement. The recall notice was specifically related to bone mills sold to Defendant at least in part under the period in which the Agreement was in effect. The alleged misrepresentations relate to the bone mills sold to Defendant at least in part under the period in which the Agreement was in effect. The alleged damages incurred by Plaintiff are related to or arise from the relationship it had, at least in part, with Defendant through the time period included in the Agreement. The allegations arise from or are related to the Agreement, and therefore must be arbitrated.

### 4.   *Patent Infringement Claim*

Defendant argues that the patent infringement claim is "really a claim that Medtronic was using Lenox's bone mills in a manner that was not allowed under the License Agreement." (Mot. at 6.) Defendant further asserts that Plaintiff claims that "the License Agreement only permitted Medtronic to re-sell the Lenox bone mills and did not authorize it to loan the mills to customers." (*Id.*) Therefore, Defendant argues, this is a dispute about the scope of the Agreement which clearly arises from and relates to the Agreement.

Plaintiff did not address the patent infringement claim in its response, and, therefore, the court must assume it does not dispute that the patent infringement claim arises from or relates to the Agreement. Regardless, the court finds that the patent infringement claim does arise from or

10

relates to the Agreement. Defendant admits in its Answer to the Complaint that it filed one patent application for its own bone mill in June 2002, nearly three years prior to the expiration of the Agreement, and that this patent was issued in November 2004, also prior to the expiration of the Agreement. (Answer ¶ 49.) Defendant admits that it filed applications for two additional patents prior to the expiration of the Agreement. (*Id.*) The timing of the patent applications and the issuance of at least one of the patents prior to the expiration of the Agreement certainly relate to Plaintiff's allegations that Defendant infringed or induced infringement of one or more claims of the '954 Patent by making, using, selling, and/or offering for sale certain of its products. Therefore, the patent infringement claim must also be arbitrated.

5. *Agreement's Mediation Requirement*

Plaintiff also argues that, pursuant to the Agreement, the parties are required to participate in mediation prior to arbitration. As set forth infra, paragraph 12 of the Agreement provides that if the parties are unable by negotiation to resolve their disputes, "the dispute[s] shall be submitted to mediation in Denver, Colorado in an attempt to resolve any existing disputes" prior to arbitration. (Mot., Ex. A at ¶ 12.)

Plaintiff argues, citing *BRM Constr., Inc. v. Marais Gaylord, L.L.C.*, No. 06CA0559, 2007 WL 1839799 (Colo. App. June 28, 2007) that this court must consider whether certain conditions precedent to arbitration have been satisfied before ordering arbitration. However, the court in *BRM Constr., Inc.*, specifically stated, to the contrary, that the issue of whether the plaintiff failed to comply with conditions precedent to arbitration was an issue for decision by the arbitrator. *BRM Constr., Inc.*, No. 06CA0559, 2007 WL 1839799, at *2, 5 (emphasis added).

The *BRM* court found that alleged conditions precedent to arbitration are not part of the factual basis underlying the claim for relief, and, therefore, a procedural objection to arbitrability must be decided by the arbitrator. *Id.* at *5. In fact, the Supreme Court has stated that "issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Howsam*, 537 U.S. at 85. Procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for the arbitrator, to decide. *Id.* at *84; *see John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed where the steps are prerequisites to arbitration).

In this case, mediation is a procedural condition precedent to arbitration. It is not part of the factual basis underlying Plaintiff's claims for relief. Therefore, a procedural objection to arbitrability must be decided by the arbitrator, not the court. Accordingly, this court finds Defendant's motion to compel arbitration is not premature.

## 6. *Motion to Stay Case Until Arbitration is Complete*

Finally, Defendant moves for a stay of this case pending completion of arbitration. The Federal Arbitration Act states as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the**

> **agreement**, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (2008) (emphasis added). Therefore, having determined all the issues in this case are "referable to arbitration" under the Agreement, a stay of the case is appropriate.

WHEREFORE, for the foregoing reasons, the court respectfully RECOMMENDS that Defendant's "Motion to Stay Lawsuit and Compel Arbitration" (Doc. No. 11) be GRANTED, and that the case be stayed pending completion of arbitration.

## ADVISEMENT TO THE PARTIES

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's

decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the Magistrate Judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 18th day of April 2008.

BY THE COURT:

s/ Kathleen M. Tafoya
KATHLEEN M. TAFOYA
United States Magistrate Judge